UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────

SAMUEL D. RUFFINO,

                              Plaintiff,


v.                                                    **REPORT
                                                        AND
                                                     RECOMMENDATION**

                                                        13-CV-800A


CAROLYN COLVIN, Acting
Commissioner of the
Social Security Administration,
                              Defendant.
───────────────────────────────────


## INTRODUCTION

         This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial

proceedings, including the preparation of a Report and Recommendation on dispositive motions.

[8]. [1] This is an action brought pursuant to 42 U.S.C. §405(g) to review the final determination of

the defendant Acting Commissioner of Social Security that plaintiff was not entitled to Social

Security Disability Insurance Benefits ("DIB"). Before me are the parties' cross-motions for

judgment on the pleadings [8, 10].

         For the following reasons, I recommend that this case be remanded to the Acting

Commissioner for further proceedings.

───────────────────────────────

[1]   Bracketed references are to the CM/ECF docket entries.

**BACKGROUND**

Plaintiff Samuel D. Ruffino filed an application for DIB and SSI on September 30, 2010 (T. 111-12).[2] He alleges a disability onset date of August 8, 2008 (T. 23). His initial application was denied (T. 58-74). An administrative hearing was subsequently held before Administrative Law Judge William E. Straub on May 30, 2012 (T. 27).  On July 3, 2012, ALJ Straub determined that although plaintiff was unable to perform his past relevant work, he retained the residual functional capacity to preform substantial gainful activity (T. 18-19). The Appeals Council refused to alter ALJ Straub's decision, making the ALJ's determination the final decision of the Acting Commissioner (T.1-3).  Plaintiff thereafter commenced this action.

The plaintiff alleges that he is disabled due to a combination of the following impairments: dizziness, confusion and mini strokes (T. 36-37). Plaintiff was 56 years old at the time of the hearing (T. 30). He has a twelfth grade education. Id.  His past relevant work was as an industrial die maker. Id.

ALJ Straub determined that plaintiff suffered from the following severe impairments: chronic obstructive pulmonary disease ("COPD"), dizziness, history of transient ischemic attacks ("TIAs")[3] and hearing loss (T. 14). While he found that plaintiff has not engaged in substantial gainful activity since his application for benefits (Id.) and could not return to his past work (T.18), ALJ Straub determined that plaintiff retained the residual functional capacity to perform medium work with the following limitations: "low contact, simple tasks" (T. 15).

Plaintiff argues that the Acting Commissioner decision must be vacated because: (1) ALJ Straub failed to properly evaluate the medical opinions of plaintiff's treating physicians, and (2)

---

[2]   References denoted as "T" are to the transcript of the administrative record.

[3]   A TIA is a form of stroke that involves "acute neurologic deficits resulting from circulatory impairment that resolve within 24 hours." Stedman's Medical Dictionary (27th ed. 2000)

ALJ Straub's credibility finding is not supported by substantial evidence. Plaintiff's

Memorandum of Law [8-1], pp.10-13.


## ANALYSIS

### A.  Standard of Review

The only issue to be determined by this Court is whether the Acting Commissioner's

decision that plaintiff was not entitled to benefits is supported by substantial evidence.  See 42

U.S.C. §405(g);  Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).  The Social Security Act

states that, upon review of the Acting Commissioner's decision by the district court, "[t]he

findings of the Acting Commissioner . . . as to any fact, if supported by substantial evidence,

shall be conclusive ". 42 U.S.C. §405(g). Substantial evidence is that which a "reasonable mind

might accept as adequate to support a conclusion".  Consolidated Edison Co. of New York. Inc.

v. NLRB, 305 U.S. 197, 229 (1938).

For purposes of entitlement to disability insurance benefits, a person is considered

disabled when he or she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months".  42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). Such a disability will be found to exist

only if an individual's "physical or mental impairment or impairments are of such severity that

[he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her]

age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy".  42 U.S.C. §§423(d)(2)(A), 1382c(a)(3)(B).

In order to determine whether plaintiff is suffering from a disability, the Acting

Commissioner must employ a five-step inquiry:

> 1. The Acting Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

> 2. If not, the Acting Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

> 3. If the claimant has a "severe impairment", the Acting Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Acting Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

> 4. If the impairment is not "listed" in the regulations, the Acting Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

> 5. If the claimant is unable to perform his or her past work, the Acting Commissioner then determines whether there is other work which the claimant could perform.

The Acting Commissioner bears the burden of proof on this last step, while the claimant

has the burden on the first four steps. Talavera v. Astrue, 697 F.3d 145 (2nd Cir. 2012) (*citing*

DeChirico v. Callahan, 134 F.3d 1177, 1179–80 (2nd Cir.1998)); *see also* 20 C.F.R. §§404.1520,

416.920.    Moreover, the ALJ has an affirmative duty to fully develop the record where

deficiencies exist. Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972); Swiantek v. Acting

Commissioner of Social Security, 588 Fed.Appx. 82, 84 (2nd Cir. 2015).

## B. **Treating Physician Rule**

Plaintiff asserts that ALJ Straub failed to properly evaluate the opinions of plaintiff's

treating physicians because more weight was given to the opinion of a consulting physician than

to plaintiff's treating physicians. Plaintiff's Memorandum of Law [8-1], pp. 10-12. The Acting

Commissioner asserts that ALJ Straub's decision was supported by substantial evidence in the

record. Acting Commissioner's Memorandum of Law [10-1], p. 7.

Plaintiff had been seen by Dr. Minsoo Kang at the Dent Neurologic Institute on May 4,

2009. Dr. Kang noted that plaintiff presented with complaints of confusion starting two years

prior (T. 188). He noted that plaintiff complained of "feeling disoriented" and that plaintiff had

given up driving farther than 2 or 3 miles because he was afraid of becoming confused and lost.

Id. During that visit, plaintiff told Dr. Kang that he had recently become disoriented such that he

felt everything was unfamiliar even though he was only about a block away from his home. Id.

Upon examination, Dr. Kang noted that plaintiff could not spell the word "world" backwards but

otherwise plaintiff had good orientation and language skill. Id. Dr. Kane assessed that plaintiff

has been experiencing confusion, disorientation and an anxiety/panic attack (T. 189). He referred

plaintiff for an MRI and neuropsychometric testing. Id. An MRI of plaintiff's head dated May

12, 2009 revealed microvascular disease and chronic inflammatory changes of the mastoid air

processes (T. 187).

In a report dated August 17, 2009, Dr. William Belles, director of the Sinus Center of

WNY, noted that plaintiff's dizziness had persisted[4] (T. 183). He also stated that plaintiff

continued to experience ringing in his ear. Id. Dr. Belles cited to an audiogram with showed

bilateral sensorineural hearing loss slightly worse in the left ear than the right. Id. He also cited

to an MRI which revealed evidence that plaintiff suffers from microvascular disease and noted

that plaintiff's left passageway was blocked by a nasal papilloma. Id. Dr. Belles stated that

---

[4]   Dr. Belles' handwritten notes relating to other examinations of plaintiff are in the record but are mostly illegible
(T. 206-10). On July 2, 2009, plaintiff reported that he had lost hearing in his left ear and felt dizzy (T. 213). Dr.
Belles' notes from an October 14, 2010 visit reflect that plaintiff "still feels dizzy" (T. 206).

plaintiff's recurrent dizziness was "both of a central and peripheral origin". Id.  He concluded

that plaintiff's hearing loss was most likely related to loud noise exposure, and that the ringing is

related to the sensorineural hearing loss for which there is not much that can be done (T. 183-

84). Dr. Belles also noted that plaintiff experienced ear pain and left-sided facial pain due to

temporomandibular joint dysfunction (T. 184).

On October 14, 2010, Dr. Belles completed a residual functional capacity evaluation

stating that plaintiff suffered from neoplasm nose, deviated nasal septum, hypertrophic

turbinates, chronic otitis media and conductive hearing loss. (T. 201). Medications prescribed for

these conditions included Zoloft, Soma, Nasonex, Lexapro and prednisone. Id. He opined that

plaintiff's condition would be expected to last for at least 12 months. Id. Dr. Belles stated that he

did not believe plaintiff was a malingerer, and that plaintiff's impairments were reasonably

consistent with his symptoms and functional limitations (T. 202). He noted that plaintiff also

suffered from anxiety. Id. Dr. Belles found that plaintiff could sit or stand no more than two

hours at one time; that he would need to take unscheduled breaks; that he should never be asked

to twist, stoop, crouch, or climb; that he has significant limitations with reaching handling or

fingering; and that he would likely be absent from work about four days per month as a result of

his condition (T. 204).

Plaintiff's primary physician, Dr. George Haddad, completed a residual functional

capacity evaluation on October 21, 2010. Dr. Haddad also opined that plaintiff could sit and

stand for two hours at one time during an eight hour workday; could occasionally lift and carry

up to 10 pounds; could not use his hands or feet for repetitive pushing and pulling or fine

manipulation; had a total restriction from unprotected heights and being around moving

machinery; had a moderate restriction from driving automobile equipment and exposure to dust

fumes and gases; and would have to lie down for some part of an eight hour workday due to his mini strokes, dizziness, COPD, conductive hearing loss, chronic otitis media, facial and ear pain (T. 214-15). Dr. Haddad opined that plaintiff would be absent for more than four days per month due to his conditions, and that he was disabled from full-time competitive employment (T. 215).

On January 14, 2011, plaintiff was seen by Dr. Donna Miller for a consultative exam in connection with his application for DIB benefits. Dr. Miller noted plaintiff's history of dizziness, confusion, ear problems, hearing loss, chronic sinusitis, diabetes, ringing in his ears, COPD and TIAs (T. 216). With respect to COPD, Dr. Miller noted that plaintiff denied a history of COPD except that his doctor told him that he has decreased lung capacity and that he undergoes pulmonary function testing every six months by his primary care physician. She stated that plaintiff denied any hospitalizations due to his breathing, but noted that plaintiff's symptoms were helped by inhalers. Id. Dr. Miller's examination was unremarkable for deficits. She diagnosed plaintiff as suffering from a history of transient ischemic attacks, chronic sinusitis, left hearing disorder, chronic obstructive pulmonary disease, and diet control diabetes (T. 219). Dr. Miller did not complete a residual functional capacity evaluation, but concluded that plaintiff should avoid operating heavy machinery, working with unprotected heights and avoid dust irritants or tobacco exposure. Id.

The "treating physician rule" directs the Acting Commissioner to give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence. Halloran v. Barnhart, 362 F.3d 28, 32 (2nd Cir. 2004) (per curiam); 20 C.F.R. §404.1527(c)(2). The treating physician rule applies to the Appeals Council as well. Snell v. Apfel, 177 F.3d 28, 134 (2nd Cir. 1999); Camarata v. Colvin, 2015 WL 4598811 (N.D.N.Y. 2015) ("When new materials are submitted from treating physicians, the Appeals Council is

'obligated to provide an explanation for [its] decision not to afford controlling weight to an assessment apparently provided by Plaintiff's treating physician'").

When the ALJ discredits the opinion of a treating physician, the regulations direct him to "always give good reasons in his notice of determination or decision for the weight [given a] treating source's opinion". 20 C.F.R. §404.1527(c)(2); Snell, 177 F.3d at 134. The ALJ first must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. Halloran, 362 F.3d 28, 32; see also 20 C.F.R. § 404.1527(c)(2)-(6). The Second Circuit has advised that the courts should not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion". Halloran, 362 F.3d at 33.

Moreover, it is well established that "the ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the treating physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician". Cabibi v. Colvin, 50 F. Supp. 3d 213, 234 (E.D.N.Y. 2014) (citing Moore v. Astrue, 2009 WL 2581718, *10 n. 22 (E.D.N.Y.  2009)). Indeed, "[t]he Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight'". Harris v. Astrue, 2009 WL 2386039, *14 (E.D.N.Y. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir.1990)). "This is because 'consultative exams are often brief, are generally performed without

the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day'". Id. (quoting Cruz, 912 F.2d at 13).

In his decision, ALJ Straub summarized the reports from Dr. Belles and Dr. Haddad (T. 16), as well as the report from Dr. Miller (T. 17). With respect to the weighing of these respective opinions, ALJ Straub's reasoning *in its entirety* was as follows:

> "As for the opinion evidence, none of the observable symptoms approach the magnitude that would require the disabling limitations that Dr. Belles and Dr. Haddad have outlined in the residual functional capacity assessment. Accordingly, the undersigned finds that these opinions do not carry controlling weight. Section 20 CFR 404.1527(d) states the frequency of examination, the nature and extent of the treatment relationship, the supportability inconsistency with the record as a whole will determine the weight given to the medical information source's opinion. However, the doctors' opinions failed to be consistent and supported by the record as a whole. The undersigned relied on the opinion of the consultative examiner [Dr. Miller] which is consistent with the medical evidence of the record. As discussed above, little weight was given to the assessments of Drs. Bellis and Haddad."

(T. 18). The Acting Commissioner's argument on this issue does no more than to parrot ALJ Straub's conclusory reasoning. Acting Commissioner's Memorandum of Law [10-1], pp. 12-13.

Although ALJ Straub identifies the factors set forth in Halloran, he provides no analysis as to how he considered any of the factors in coming to his conclusion to give Dr. Miller's opinion controlling weight. While he states in conclusory manner that the opinions of Dr. Belles and Dr. Haddad "failed to be consistent and supported by the record as a whole", ALJ Straub does not cite to any specific finding that was inconsistent with the opinions of plaintiff's treating physicians. It is undisputed that the record reflects evidence that plaintiff experienced various mini strokes and hearing loss confirmed by clinical testing, as well as persistent dizziness.  (T. 174-78; 179; 180-81; 18-84; 187; 188-89; 190-91). Indeed, ALJ Straub expressly found that

plaintiff suffers from "medically determinable impairments [which] could reasonably be expected to cause the alleged symptoms" (T. 17).[5]

Here, two of plaintiff's treating physicians, including a specialist, provided residual functional capacity evaluations finding that plaintiff had significant functional limitations and would miss more than four days per month as a result of his impairments or treatment for those impairments.[6] In light of the fact that the record includes test results evidencing plaintiff's history of mini strokes and hearing loss, as well as persistent complaints of dizziness, and particularly inasmuch as ALJ Straub acknowledged that the plaintiff suffered from medically determinable impairments which could reasonably be expected to cause the alleged symptoms, it was incumbent upon ALJ Straub to identify specific inconsistencies sufficient to undermine the opinions of Dr. Belles and Dr. Haddad.

Although Dr. Miller's report was less restrictive than those of Drs. Belles and Haddad, it should be noted that Dr. Miller's findings appear to be based solely on a single examination and not upon any clinical testing. Other than one pulmonary function test (T. 219), it does not appear that Dr. Miller reviewed plaintiff's test results.  Moreover, since Dr. Miller did not complete a residual functional capacity evaluation, ALJ Straub fails to explain how plaintiff could perform the exertion level of medium work on a sustained basis in light of the residual functional capacity evaluations by plaintiff's treating physicians. In any event, by giving controlling weight to the

---

[5]    Elsewhere in his decision, ALJ Straub noted that plaintiff does the laundry once a week, drives to a nearby convenience store, watches TV and uses a computer (T. 15). The record does not reflect that the manner in which plaintiff performs these chores evidences his ability to perform substantial gainful activity on a sustained basis. *See* Gold v. Secretary of HHS, 463 F.2d 38, 41 n. 6 (2d Cir.1972) (noting that "one need not be completely helpless or unable to function").

[6]    ALJ Straub did not call a vocational expert to testify in this case. Missing four days per month due to an impairment precludes a claimant from competitive employment. *See* Raymer v. Colvin, 2015 WL 5032669, at *6 (W.D.N.Y. 2015)(claimant was likely to be absent approximately four days each month, and the vocational expert testified that absences in excess of one day per month would preclude competitive employment for unskilled, entry level work); Stewart v. Barnhart, 235 F.R.D. 579, 590-91 (W.D.N.Y. 2006)(if plaintiff were to be out sick four or more times per month, he would not be able to work).

- 10 -

consulting opinion without adequately explaining why the opinions of the treating physicians were not entitled to controlling weight, ALJ Straub ran afoul of <u>Halloran</u> and <u>Cruz</u>.

This case should be remanded so that the Acting Commissioner can properly assess the opinions of plaintiff's various treating physicians.

## C. Credibility

Plaintiff also argues that ALJ Straub's determination regarding the credibility of plaintiff's testimony was not supported by substantial evidence in the record. Plaintiff's Memorandum of Law [8-1], pp. 12-13. The Acting Commissioner asserts that ALJ Straub properly discounted plaintiff's subjective complaints because plaintiff gave inconsistent reasons for why he stopped working,[7] and that by applying for and receiving unemployment benefits plaintiff had certified that he was ready, willing and able to work for 3½ years after the plant closing in 2008 (T. 18). Acting Commissioner's Memorandum of Law [10-1], p. 15.

At the hearing, plaintiff testified that he started to experience his symptoms of dizziness and confusion while he was still working as a die maker (T. 35). He stated that he made repeated mistakes in calibrating the machines he worked on, and that he would not have been able to continue if it were not for his brother, who was his supervisor, who would assist him at work. <u>Id</u>. He testified that he made mistakes that damaged the machines and ruined parts, but that his brother covered for him (T. 44). After that, for the last two to three years he worked at the plant, his brother would punch in the numbers to set the machines for him so that he did not further damage the machines or ruin parts. <u>Id</u>. Plaintiff stated that when he started getting confused he

---

[7]    A Disability Report completed by plaintiff stated that he stopped working because of his conditions (T. 135). A Report of Contact made by agency personnel reflects that plaintiff stated that "he sometimes gets depressed over his life situation as to his health and losing his job with his plant closed" (T. 141). ALJ Straub states that this suggests that he stopped working due to the plant closing, not due to his impairments. (T. 18).

thought he had problems with his diabetes, but Dr. Belles told him he was having mini strokes and that he had some swelling on the left side of his brain (T. 36). He testified that he feels pressure in his head "all the time," and that he gets confused and disoriented. Id. The confusion will last between half an hour to an hour (T. 39). He stated that when it happens he lies down and that he is "in and out of lying down all day, because it comes and it goes, and it's the dizziness, and the ear, and the pressure". Id. Plaintiff stated that he is no longer active because of his condition (T. 36). He only drives a short distances because he becomes disoriented. Id. He cooks for himself, but only easy meals because he cannot do a lot of standing (T. 37-38). His nephew shops for him (T. 38).  He does laundry once a week, watches television and uses a computer (T. 40). He pays a neighbor to do yardwork (T. 43).

Plaintiff's brother, Jerry Ruffino, also testified at the hearing (T. 49). His testimony largely corroborated plaintiff's testimony. He stated that he worked at the plant with plaintiff and that he was in charge of the area where they worked (T. 50). Ruffino stated that starting around 2005 he noticed that plaintiff would become disoriented (T. 52). Because Ruffino was in charge he could "hide" any "missteps" by plaintiff. Id. He stated that after a while, he would do parts of plaintiff's job for him. Id. Ruffino stated that before he realized that his brother had a problem, he would joke about plaintiff's mistakes as being "Sammy's greatest hits", because they called it a "hit" when the machine crashed (T. 53). Ruffino testified that plaintiff would not have been able to keep his job if it were not for Ruffino's assistance. Id. Ruffino testified that he drives plaintiff to places when plaintiff has to go somewhere (T. 54).

An ALJ must consider all of the evidence in record, including statements the claimant or others make about his or her impairments, restrictions, daily activities, efforts to work, or any other relevant statements the claimant makes to medical sources during the course of

examination or treatment, or to the agency during interviews, on applications, in letters, and in

testimony during administrative proceedings. Genier v. Astrue, 606 F.3d 46, 49 (2nd Cir. 2010)

(*citing* 20 C. F.R. §404.1512(b)(3)). SSR 96–7p includes a two-part inquiry for evaluating a

plaintiff's contentions of pain and their symptoms:

> "First, the adjudicator must consider whether there is an underlying medically
> determinable physical or mental impairment(s) -- i.e., an impairment(s) that can
> be shown by medically acceptable clinical and laboratory diagnostic techniques --
> that could reasonably be expected to produce the individual's pain or other
> symptoms. The finding that an individual's impairment(s) could reasonably be
> expected to produce the individual's pain or other symptoms does not involve a
> determination as to the intensity, persistence, or functionally limiting effects of
> the individual's symptoms. If there is no medically determinable physical or
> mental impairment(s), or if there is a medically determinable physical or mental
> impairment(s) but the impairment(s) could not reasonably be expected to produce
> the individual's pain or other symptoms, the symptoms cannot be found to affect
> the individual's ability to do basic work activities.
>
> Second, once an underlying physical or mental impairment(s) that could
> reasonably be expected to produce the individual's pain or other symptoms has
> been shown, the adjudicator must evaluate the intensity, persistence, and limiting
> effects of the individual's symptoms to determine the extent to which the
> symptoms limit the individual's ability to do basic work activities. For this
> purpose, whenever the individual's statements about the intensity, persistence, or
> functionally limiting effects of pain or other symptoms are not substantiated by
> objective medical evidence, the adjudicator must make a finding on the credibility
> of the individual's statements based on a consideration of the entire case record.
> This includes the medical signs and laboratory findings, the individual's own
> statements about the symptoms, any statements and other information provided by
> treating or examining physicians or psychologists and other persons about the
> symptoms and how they affect the individual, and any other relevant evidence in
> the case record. . . . These provisions of the regulations provide that an
> individual's symptoms, including pain, will be determined to diminish the
> individual's capacity for basic work activities to the extent that the individual's
> alleged functional limitations and restrictions due to symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other evidence in
> the case record."

SSR 96-7P, 1996 WL 374186,*2.

The applicable regulations recognize that a claimant's "symptoms can sometimes suggest

a greater level of severity than can be shown by the objective medical evidence alone". SSR 96–

7p, 1996 WL 374186, *3. However, when the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§404.1529(c)(3) (I)-(vii); 416.929(c)(3)(I)-(vii).

Here, ALJ Straub found that although plaintiff's medically determinable impairments could be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with ALJ Straub's residual functional capacity assessment (T. 17). In support of this determination, ALJ Straub stated:

> "In terms of the claimant's alleged limitations, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant has a good earnings record, which ordinarily raises a favorable inference of an individual well motivated to work within these capabilities. However, there are additional factors that outweigh that inference. The claimant applied for and received New York State Unemployment Insurance benefits, which required him to certify that he was ready, willing and able to work to receive those benefits. He testified that he received benefits for 3 ½ years. A report of contact dated November 30, 2010 stated that the claimant reports that he sometimes gets depressed over his life situation as to his health and losing his job when his plant closed. This suggests that the claimant stopped working due to the plant closing rather than do to his alleged disabling impairments. However, in a disability report, the claimant stated that he stopped working on August 8, 2008 due to his condition."

(T. 18).

Again, ALJ Straub fails to identify any specific daily activity which is inconsistent with plaintiff's alleged complaints.  The fact that plaintiff does laundry once a week, or cooks simple meals, watches television and uses a computer, does not contradict the plaintiff's testimony as to his limitations in any way. "The mere fact that an individual is mobile and able to engage in some light tasks at his home does not alone establish that he is able to engage in substantial gainful activity." Gold, 463 F.2d at 41, n. 6.

ALJ Straub's decision reflects that he placed great weight on the fact that plaintiff was receiving unemployment benefits for some part of the period for which he claims he was disabled. The fact that plaintiff was receiving unemployment benefits during the period for which he claims he was disabled is a factor that can be considered in weighing the credibility of plaintiff's subjective complaints. See Jackson v. Astrue, 2009 WL 3764221,*8 (N.D.N.Y. 2009) (although it is not "proof positive" that plaintiff was not disabled, an ALJ may properly consider plaintiff's claim for unemployment benefits when assessing plaintiff's credibility). However, the receipt of unemployment benefits is only one factor to be considered when weighing a claimant's credibility.  If the plaintiff has demonstrated a *prima facie* entitlement to DIB, the fact that a plaintiff received unemployment benefits for some part of the alleged period of disability is insufficient by itself to deny DIB benefits. Flores v. Department of Health, Ed. and Welfare, 465 F. Supp. 317 (S.D.N.Y. 1978).  Further, the weight given to the fact that the claimant received unemployment benefits may be mitigated if the claimant did not fully understand the nature of the unemployment certification. *See* Hamilton v. Colvin, 8 F. Supp. 3d. 232, 244 (N.D.N.Y. 2013) (plaintiff's credibility should be reconsidered upon remand because there was some question as to whether the plaintiff fully understood the unemployment certification with respect to his application for disability benefits).

ALJ Straub also notes that there is an inconsistency in the record as to whether the plaintiff stopped working because of his disabilities or because the plant where he worked closed.  It should be noted that based upon the testimony from plaintiff and his brother, Jerry Ruffino, it is at least questionable whether plaintiff would have been able to maintain his die maker job if it were not for the assistance of Ruffino. Under these unusual circumstances, plaintiff may have been able to continue employment notwithstanding disabling impairments because other employees were doing his work for him. While plaintiff is certainly not entitled to DIB benefits during such time he continued to be employed, it may explain any inconsistency between plaintiff's statements as to why he stopped work. Although ALJ Straub noted that Jerry Ruffino testified at the hearing, ALJ Straub does not discuss the import of this testimony regarding plaintiff's ability to maintain employment.

I have recommended that this case be remanded so that the Acting Commissioner can properly assess the opinions of plaintiff's treating physicians.  After doing so, it will be necessary for the Acting Commissioner to reconsider the credibility of the testimonial evidence presented by plaintiff and his brother to determine if it is consistent with the record as a whole after the re-assessment of the opinions provided by plaintiff's treating physicians.

## CONCLUSION

For these reasons, I recommend that plaintiff's motion for judgment on the pleadings [8] be granted to the extent that this case be remanded to the Acting Commissioner for further proceedings consistent with this Report and Recommendation and that the Acting Commissioner's motion for judgement on the pleadings [10] be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by November 16, 2015 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: October 30, 2015

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge

- 17 -